J-S16032-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA　　:　　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　　　　　　:　　　　　　PENNSYLVANIA
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　v.　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
MATHEW STEFAN MORALES,　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Appellant　　　　　　　:　　　　　No. 1143 MDA 2018

Appeal from the PCRA Order Entered June 19, 2018
in the Court of Common Pleas of Lancaster County
Criminal Division at No(s):  CP-36-CR-0001430-2015

BEFORE:  OTT, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:　　　　　　　　**FILED MAY 31, 2019**

Mathew Stefan Morales ("Morales") appeals from the Order denying his Petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"). *See* 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

On February 8, 2016, a jury found Morales guilty of first-degree murder for the shooting death of Xavier Garriga ("the victim"), following an argument in a Turkey Hill store.  *See* 18 Pa.C.S.A. § 2502(a).  The trial court sentenced Morales to a mandatory term of life in prison without the possibility of parole. Morales filed a post-sentence Motion, which the trial court denied.  After Morales filed an untimely Notice of Appeal, he filed a counseled Motion to Reinstate Appellate Rights *Nunc Pro Tunc*, which the PCRA court granted.  This Court affirmed Morales's judgment of sentence on May 11, 2017.  *See Commonwealth v. Morales*, 170 A.3d 1207 (Pa. Super. 2017) (unpublished memorandum).

On July 5, 2017, Morales, *pro se*, filed the instant timely PCRA Petition. The PCRA court appointed Morales counsel, who filed an Amended Petition on his behalf. The Commonwealth filed an Answer. The PCRA court conducted an evidentiary hearing on March 8, 2018, after which both parties submitted briefs. On June 19, 2018, the PCRA court denied Morales's Petition. Morales filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

On appeal, Morales raises the following claims for our review:

A. Whether trial counsel was ineffective when he failed to object when the prosecutor introduced evidence that [Morales] had a tattoo stating "Respect Few Fear None[,]" and cited those words in his closing argument[,] which comments were inflammatory and unduly prejudicial?

B. Whether trial counsel was ineffective when he failed to file a meritorious motion to suppress various items[,] which were seized pursuant to a search warrant[,] when the affidavit for said warrant failed to set forth probable cause to believe that items subject to seizure would be found in the place to be searched?

C. Whether trial counsel was ineffective when he failed to call Frank Costanzo [("Costanzo")] as an expert witness at trial[,] when [] Costanzo was ready, willing and able to testify that the analysis performed by the Commonwealth's expert, Sergeant [Jeffrey] Jones [("Sgt. Jones")], was flawed[,] and that there was insufficient evidence to determine the location of [Morales's] vehicle at the time the victim was shot?

D. Whether trial counsel was ineffective when he failed to object to the testimony of Detective [John Wettlaufer] [("Detective Wettlaufer")] concerning the use of trajectory rods[,] when Detective Wetlauffer was not properly qualified as an expert witness?

Brief for Appellant at 4 (issues reordered).

Morales's claims challenge the effectiveness of his trial counsel. The applicable standards of review regarding the dismissal of a PCRA petition and ineffectiveness claims are as follows:

> Our standard of review of a PCRA court's denial of a petition for post[-]conviction relief is well-settled: We must examine whether the record supports the PCRA court's determination, and whether the PCRA court's determination is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.
>
> * * *
>
> It is well-established that counsel is presumed to have provided effective representation unless the PCRA petition pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error. The PCRA court may deny an ineffectiveness claim if the petitioner's evidence fails to meet a single one of these prongs. Moreover, a PCRA petitioner bears the burden of demonstrating counsel's ineffectiveness.

*Commonwealth v. Franklin*, 990 A.2d 795, 797 (Pa. Super. 2010) (citations omitted).

In his first claim, Morales asserts that trial counsel was ineffective for failing to object to the admission of evidence that Morales has a tattoo reading "Respect Few Fear None." Brief for Appellant at 22. Morales contends that the language of his tattoo has no probative value, but was instead an attempt by the Commonwealth to create an inference that Morales had violent propensities. *Id.* at 23. Additionally, Morales points out that the prosecutor referred to the language of the tattoo again during closing arguments, which,

Morales asserts, was an attempt to inflame the passions of the jury. *Id.* at 23-24. Morales claims that trial counsel failed to articulate a reasonable basis for his failure to object to evidence of the tattoo. *Id.* at 24-25. Additionally, Morales argues that he was prejudiced as a result of counsel's inaction because the prosecutor essentially asked the jury to render a verdict based on emotion. *Id.* at 25.

In its Opinion, the PCRA court set forth the relevant law, addressed Morales's claim, and concluded that it lacks merit. *See* PCRA Court Opinion, 9/7/18, at 5-12. Specifically, the PCRA court concluded that Morales's underlying claim lacks merit because the prosecutor's comment (1) was fair, based on the evidence presented; (2) was offered to rebut Morales's credibility; and (3) did not violate a constitutionally or statutorily protected right. *See id.* at 8. Moreover, after summarizing the "overwhelming" evidence of Morales's guilt established at trial, the PCRA court concluded that the outcome of Morales's trial "was not affected in any meaningful way" by the evidence concerning, or the prosecutor's comments regarding, Morales's tattoo. *See id.* at 8-12. We agree with the PCRA court's cogent analysis, which is supported by the record. Therefore, we affirm on this basis as to Morales's first issue. *See id.* at 5-12.

In his second claim, Morales challenges trial counsel's effectiveness for failing to file a motion to suppress evidence seized from his apartment (including, *inter alia*, a .40 caliber Glock semi-automatic pistol, a pistol box, a magazine for a Glock semi-automatic pistol, and a gun cleaning kit). Brief for

Appellant at 25, 30.  Morales contends that the Affidavit for the search warrant is "grossly defective," and did not establish a reasonable probability that the firearm used in the shooting would be located in his apartment.  *See id.* at 27-30.  Morales argues that trial counsel had no reasonable basis for failing to file a motion to suppress.  *Id.* at 30.  Morales also claims that he was prejudiced by counsel's failure because the evidence admitted at trial was used to show that Morales is a gun owner and firearms aficionado, but had little probative value as to his identity as the shooter.  *Id.* at 30-31.

In its Opinion, the PCRA court set forth the relevant law, addressed Morales's claim, and concluded that it lacks merit.  *See* PCRA Court Opinion, 9/7/18, at 12-18.  Because the PCRA court's sound reasoning is supported by the record and free of legal error, we affirm on this basis as to Morales's second claim.  *See id.*

In his third claim, Morales argues that trial counsel was ineffective for failing to call Costanzo as an expert witness to testify that the analysis performed by Sgt. Jones, the Commonwealth's expert witness in forensic reconstruction, was flawed.  *See* Brief for Appellant at 14-22.  Specifically, Sgt. Jones opined that the fatal shot had come from Morales's vehicle, which he was driving at that time.  *Id.* at 15-16.  Morales claims that Costanzo, the proprietor of Accident Cause and Analysis, LLC, who has more than 30 years of experience in investigations and reconstructions, was ready and willing to testify at trial regarding the following weaknesses and discrepancies in Sgt. Jones's testimony:

- The victim walked 535 feet from the Turkey Hill store on New Holland Avenue to the location where he was shot, but only about 75 feet of that walk was recorded on cameras. Sgt. Jones's calculations assumed that the victim walked at the same speed for the entire 535 feet, which is "pure speculation."

- Sgt. Jones's calculations assumed an "average" acceleration to turn out of the Turkey Hill parking lot, onto New Holland Avenue, even though there was no indication that the vehicle accelerated in an "average" manner.

- Based on Sgt. Jones's "flawed" assumption that the victim walked at the same speed on New Holland Avenue as he had walked within the Turkey Hill parking lot, Sgt. Jones excluded the possibility that a light-colored SUV, which was in the area at approximately the same time as the shooting, could have been involved.

*Id.* at 18-19. According to Morales, trial counsel's asserted basis for failing to call Costanzo as a witness (*i.e.*, to avoid giving the Commonwealth a copy of Costanzo's report prior to trial, in an effort to surprise Sgt. Jones and more effectively damage Sgt. Jones's credibility), was "unsuccessful" and "not particularly effective." *Id.* at 19-20; *see also id.* at 20 (arguing that Sgt. Jones "was a veteran witness and [] must have been well aware of the weaknesses in his analysis."). Morales argues that he was prejudiced by trial counsel's inaction because Costanzo's testimony "was the one and only explanation which made sense given the limited information available in this case." *Id.* at 21.

In its Opinion, the PCRA court set forth the relevant law, addressed Morales's claim, and concluded that it lacks merit. *See* PCRA Court Opinion, 9/7/18, at 19-25. Specifically, the PCRA court set forth Sgt. Jones's expert

testimony regarding his accident reconstruction analysis. *See id.* at 19-21. The PCRA court additionally pointed out that trial counsel met with Costanzo twice prior to trial, and Costanzo helped trial counsel prepare for the cross-examination of Sgt. Jones. *See id.* at 21-22; *see also id.* at 22 (noting Costanzo's testimony during the PCRA hearing that trial counsel had "followed through" with the cross-examination questions they had prepared). We agree with the PCRA court's analysis, which is supported by the record, and affirm on this basis as to Morales's third claim. *See id.* at 19-25.

In his fourth claim, Morales avers that trial counsel was ineffective for failing to object to Detective Wettlaufer's testimony concerning bullet trajectory analysis, as he was not properly qualified as an expert witness. Brief for Appellant at 31-32. Morales claims that the use of trajectory rods to plot a bullet's trajectory requires specialized knowledge. *Id.* at 32. Morales acknowledges this Court's decision in *Commonwealth v. Kennedy*, 151 A.3d 1117, 1122-27 (Pa. Super. 2016) (collecting cases and, in a matter of first impression, holding that a police officer's testimony concerning bullet trajectories was a permissible lay opinion, and did not require the specialized knowledge of an expert witness), but points out that the *Kennedy* decision was filed after the jury trial in the instant case. Brief for Appellant at 33; *see also id.* (wherein Morales stated his wish to challenge the *Kennedy* decision). Morales also argues that counsel's asserted basis for failing to object to the trajectory testimony (*i.e.*, that Detective Wettlaufer's testimony could be useful for Morales's case to show that the shot could have been fired from

another vehicle) was unreasonable, because Detective Wettlaufer had not conducted an analysis relative to the opposing lane of travel. *Id.* at 33-34. Morales claims that he was prejudiced by trial counsel's failure because Detective Wettlaufer's testimony corroborated the testimony of other witnesses. *Id.* at 34.

In its Opinion, the PCRA court set forth the relevant law, addressed Morales's final claim, and concluded that it lacks merit. *See* PCRA Court Opinion, 9/7/18, at 25-28. The PCRA court specifically remarked that Detective Wettlaufer "made it clear to the jury that he was not testifying as an expert, nor was he offering an opinion to a reasonable degree of scientific certainty." *Id.* at 26. The PCRA court's reasoning is supported by the record and free of legal error. We therefore affirm on this basis as to Morales's final claim. *See id.* at 25-28. Moreover, we must decline Morales's invitation to revisit this Court's sound decision in *Kennedy*.

Based upon the foregoing, we affirm the PCRA court's Order denying Morales's Petition for relief.

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/31/2019

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA**
**CRIMINAL**

COMMONWEALTH OF PENNSYLVANIA :

                                         :     No.    1143 MDA 2018

vs.

MATHEW STEFAN MORALES            No.    CP-36-CR-0001430-2015

### PA R.A.P. 1925 OPINION

BY TOTARO, J.

Before the Superior Court of Pennsylvania is an appeal from an order dismissing the Amended Motion for Post-Conviction Collateral Relief ("PCRA") filed by Vincent J. Quinn, Esquire, as counsel for Mathew Stefan Morales ("Appellant"). On June 19, 2018, following a hearing, the court issued an order dismissing the amended motion. On July 10, 2018, Appellant timely filed a Notice of Appeal. For the reasons stated herein, the appeal should be denied.

### PROCEDURAL AND FACTUAL BACKGROUND

On February 8, 2016, Appellant appeared before the court for trial on one count of criminal homicide.[1] At the conclusion of a five-day jury trial, Appellant was found guilty of murder of the first degree.[2] On February 16, 2016, Appellant was sentenced to a mandatory term of life imprisonment without the possibility of parole. *See* Sentencing Order.

On February 17, 2016, Appellant filed a post-sentence motion alleging that the jury's verdict was against the weight of the evidence presented at trial. *See* Post-Sentence Motion. On April 5, 2016, the court issued an order denying the motion. On May 23, 2016, after his appeal rights were reinstated *nunc pro tunc*, Appellant filed a Notice of Appeal to the Superior Court of

---

[1] 18 Pa.C.S.A. § 2501(a).

[2] 18 Pa.C.S.A. § 2502(a).

Pennsylvania. Thereafter, Appellant timely filed a Statement of Errors Complained of on Appeal ("Statement"), alleging the jury's verdict was against the weight of the evidence and there was insufficient evidence of intent for the jury to find Appellant guilty of murder of the first degree. *See* Statement. On May 11, 2017, the Superior Court affirmed the judgment of sentence.[3]

On July 5, 2017, Appellant timely filed a *pro se* PCRA petition, claiming ineffective assistance of trial counsel which so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place because trial counsel failed to: (1) hire an expert bullet trajectory analyst to rebut Detective Wettlaufer's opinion; (2) hire an expert accident reconstruction analyst to rebut Sergeant Jones' opinion; (3) object to the prosecutor's closing argument referencing Appellant's tattoo; and (4) investigate the Commonwealth's declarations that Luis Fuentes ("Fuentes") was neither promised nor received leniency for his testimony as a witness against Appellant. *See* Post Conviction Relief Act Petition.

On July 11, 2017, Vincent J. Quinn, Esquire, was appointed as PCRA counsel. On January 8, 2018, PCRA counsel filed an amended motion asserting that trial counsel provided ineffective assistance of counsel for failing to: (1) object to the admissibility of evidence relating to Appellant's tattoo, or to the prosecutor's closing argument referencing that tattoo; (2) file a motion to suppress evidence seized pursuant to a search warrant, which PCRA counsel claims lacked probable cause to believe that evidence of criminal activity, contraband, or other items were located in the apartment; (3) call accident reconstruction analyst Frank M. Costanzo as an expert witness to rebut the testimony of the Commonwealth's expert; and (4) object to the

---

[3] *Commonwealth v. Morales*, No. 833 MDA 2016, 2017 WL 1957754, at *1-15 (Pa. Super. May 11, 2017).

2

testimony of Detective Wettlaufer when he offered impermissible testimony on bullet trajectory analysis without having been qualified as an expert. *See* Amended PCRA Motion.

The Commonwealth filed a response on January 12, 2018, asserting that because substantive evidence of Appellant's guilt was overwhelming, the outcome of the case was not affected by the existence of Appellant's tattoo. *See* Commonwealth's Answer to the Amended Motion for Post-Conviction Collateral Relief. Moreover, because the search warrant established probable cause to search Appellant's residence for firearm accessories and paraphernalia, any suppression motion would have been frivolous. *Id.* Alternatively, if a suppression motion was successful, the materials seized were of little significance in light of the overwhelming evidence of guilt. *Id.* Furthermore, because a police officer does not have to be qualified as an expert witness to offer bullet trajectory analysis of this sort, any objection to Wettlaufer's testimony would have been meritless. *Id.* Thus, the Commonwealth asserted that Appellant was not entitled to a hearing on these claims. *Id.* The Commonwealth did agree that a hearing would be necessary to determine whether trial counsel was ineffective for not calling Frank Costanzo as an expert witness to rebut the testimony of the Commonwealth's expert. *Id.*

On March 8, 2018, the court conducted an evidentiary hearing, and the issues were later briefed by counsel. Thereafter, on June 19, 2018, the PCRA court issued an opinion and order dismissing the Amended PCRA Petition. On July 10, 2018, Appellant filed the instant appeal. A Statement of Errors Complained of on Appeal ("Statement") was timely filed on July 24, 2018, in which Appellant asserts the PCRA court erred by failing to find that trial counsel was ineffective regarding the issues raised in his amended PCRA motion. *See* Statement. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

3

## DISCUSSION

To obtain relief under the PCRA, a petitioner must plead and prove by a preponderance of the evidence that: (1) he has been convicted of a crime under the laws of this Commonwealth and is currently serving a sentence of imprisonment, probation, or parole for that crime; (2) the conviction resulted from one or more of the statutorily enumerated errors; (3) the allegation of error has not been previously litigated or waived; and (4) the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel. 42 Pa.C.S.A. § 9543(a). Ineffective assistance of counsel is a statutorily enumerated error under the PCRA. 42 Pa.C.S.A. § 9543(a)(2)(ii).

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "(1) the underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." *Commonwealth v. Lambert*, 797 A.2d 232, 243 (Pa. 2001); *see also Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner's failure to address any prong will defeat an ineffectiveness claim. *Commonwealth v. Walker*, 36 A.3d 1, 7 (Pa. 2011).

A court is not required to analyze the elements of an ineffective assistance of counsel claim in any particular order, but may proceed first to any element of the test where a claim may fail. *Commonwealth v. Hannibal*, 156 A.3d 197, 207 (Pa. 2016). If the court begins by determining the underlying claim is meritless, trial counsel may not be found ineffective and there is no need to evaluate the other required elements of ineffective assistance of counsel. *Id.*

4

In determining whether counsel's course of conduct had a reasonable basis designed to effectuate their interest, a petitioner must establish that counsel did not act in his best interests. *Commonwealth v. Pander*, 100 A.3d 626, 631 (Pa. Super. 2014). Counsel is presumed to be effective, and a petitioner bears the burden of proving otherwise. *Commonwealth v. Fears*, 86 A.3d 795, 804 (Pa. 2014). Counsel is given broad discretion in determining trial tactics and strategy. *Commonwealth v. Fowler*, 703 A.2d 1027, 1029 (Pa. 1997). The test is not whether other strategies were more reasonable using a hindsight evaluation of the record, but whether counsel's decision had a reasonable basis to advance a petitioner's interests. *Commonwealth v. Mason*, 130 A.3d 601, 618 (Pa. 2015). "An evaluation of counsel's performance is highly deferential, and the reasonableness of counsel's decisions cannot be based on the distorting effects of hindsight." *Commonwealth v. Kelley*, 136 A.3d 1007, 1012 (Pa. Super. 2016) (quoting *Commonwealth v. Saranchak*, 866 A.2d 292, 304 (Pa. 2005).

When determining whether there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's alleged ineffectiveness, a petitioner must establish resulting prejudice or the claim will fail. *Commonwealth v. Miller*, 987 A.2d 638, 648-49 (Pa. 2009). A petitioner must demonstrate that ineffective assistance of counsel so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Whitney*, 708 A.2d 471, 475 (Pa. 1998).

I.  **The PCRA Court did not err in finding that trial counsel was not ineffective for not objecting to the admissibility of evidence regarding Appellant's tattoo, or to the prosecutor's closing argument referencing the tattoo.**

Appellant asserts that trial counsel was ineffective for failing to object to the admissibility of evidence regarding Appellant's tattoo, which he claims was irrelevant and highly prejudicial.

5

*See* Statement. Moreover, counsel was ineffective for failing to object to the prosecutor's closing argument which referenced Appellant's tattoo, arguing it was inflammatory and irrelevant. *Id.*

At trial, the prosecutor played a three-hour recorded statement Appellant gave to the police regarding this incident. (Com. Exh. #9); (Notes of Testimony, Trial at 241-52) ("N.T."). In that statement, when Appellant was shown a convenience store video of a confrontation he had with the victim shortly before the shooting, Appellant claimed he told the victim to "have a blessed day." (Com. Exh. #9); (N.T. at 688). There was also brief reference to Appellant's tattoo, which read "Respect Few Fear None." (Com. Exh. #9); (Notes of Testimony, PCRA at 3-4, 26-27) ("N.T. PCRA"). When police asked Appellant about the tattoo, Appellant said it was "something he got when he was younger." (N.T. PCRA at 26-27).

During his closing argument, in an attempt to rebut Appellant's assertion that he simply wished the victim a blessed day, the prosecutor reminded the jury of testimony from a witness by the name of Fuentes, who stated that Appellant was acting aggressively at that time. (N.T. at 688). The prosecutor also reminded the jury of testimony from the store clerk, who stated that Appellant was using profanity against the victim and offering to "take it outside." *Id.* The prosecutor then referenced Appellant's tattoo to challenge Appellant's credibility about what was said during the encounter. *Id.* at 688-89. The prosecutor stated the following:

> Victim was about to walk away. It's the defendant talking to him, profanity. Maybe that's where he said it, have a blessed day, sir. Come on. Have a blessed day?
>
> Other words you should keep in mind instead of have a blessed day. Respect few, fear none. Guess where those words came from. They come from his body. Remember the talk about the tattoos in the interview? Respect few, fear none. That's how he acted. The clerk says it, Mr. Fuentes says it, and the video shows it.

*Id.* at 689.

At the PCRA hearing, trial counsel stated he did not object to the testimony because he did not believe it was prejudicial in the way it was presented in the video interview. (N.T. PCRA at 26-28). Appellant's conversation with the detectives was amicable, and counsel believed that Appellant's explanation about the reason for the tattoo did not lead to any prejudice. *Id.* at 28. Counsel also did not think it was prejudicial when the prosecutor mentioned the tattoo in his closing argument. *Id.* at 27-28. Although counsel did state that perhaps in hindsight he should have objected to the statement to preserve the issue on appeal, he thought "it was fair comment on the evidence that was presented" and did not think it was a meritorious objection. *Id.* at 27.

Evidence must be relevant to be admissible. *Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa. Super. 2015). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Id.* (quoting *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002)). If the probative value of the evidence is outweighed by a danger of unfair prejudice, the court may exclude relevant evidence. *Id.*; Pa.R.E. 403.

In the present case, testimony about the tattoo was not offered to show that Appellant had a propensity for violence. Rather, it was relevant to assist the jury in determining whether Appellant was credible when he claimed to police that he wished the victim a blessed day. Furthermore, the probative value outweighed any prejudice. As such, trial counsel was not ineffective for failing to raise a meritless claim through a motion in limine or an objection.

Moreover, to succeed on a claim of ineffective assistance where counsel does not object to prosecutorial misconduct during the closing argument, a petitioner must demonstrate that the prosecutor's actions violated a constitutionally or statutorily protected right, such as the privilege

7

against compulsory self-incrimination, the right to a fair trial, or a constitutional interest such as due process. *Commonwealth v. Busanet*, 54 A.3d 35, 64 (Pa. 2012). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* (internal quotations and citations omitted). A defendant carries the heavy burden of establishing that the argument was genuinely prejudicial to the defendant, the prejudice was not cured by the court's instructions, counsel did not have a reason for not objecting to the remarks, and counsel's failure to object denied the defendant of a fair trial. *Commonwealth v. Thompson*, 660 A.2d 68, 75 (Pa. Super. 1995).

In the instant case, the prosecutor's closing argument was fair comment based on the relevant evidence presented. Further, the comment was not an attempt to inflame the passions of the jury, but was offered to rebut Appellant's credibility. Moreover, the comment did not violate a constitutionally or statutorily protected right. Consequently, this claim must fail. However, even if the prosecutor's comment during closing argument was prejudicial, the Superior Court has stated that the prejudicial effect of such a remark can be cured by a trial court's instruction to the jury that counsel's closing arguments are not evidence. *Thompson*, 660 A.2d at 76. The trial court in this case did instruct the jury on two separate occasions that counsel's closing argument was not to be considered as evidence. (N.T. at 648-49, 712-13).

Assuming, *arguendo*, the underlying claim is of arguable merit, Appellant must also show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Because the following evidence presented at trial was overwhelming in establishing Appellant's guilt, and the outcome of the case was not affected in any meaningful way by evidence or comments relating to Appellant's tattoo, Appellant has failed in this regard.

8

Officer Kelly Spence ("Spence") of the Manheim Township Police Department ("MTPD") testified that on June 21, 2014, at 3:20 a.m., she received a call indicating there was a shooting with a person down in the 1100 block of Helen Avenue. (N.T. at 114-15). Spence responded to the general area of the shooting and began looking for a victim. *Id.* at 115-16. Spence then heard an officer say they found somebody on the sidewalk in the 800 block of New Holland Pike. *Id.* at 116. When she arrived at that location, Spence saw a person, later identified as Xavier Garriga ("victim"), laying on his back, bleeding, and barely breathing. *Id.* at 117.

Officers went to the Turkey Hill store located at 806 New Holland Avenue, a short distance from the crime scene, where they discovered there had been an altercation between two customers. (N.T. at 230). Angel Mateo-Viera ("Viera"), a cashier at the store, testified that an argument took place at roughly 3:00 a.m. between two men near the cash register inside the Turkey Hill. *Id.* at 129-30. The victim entered the store by himself and was there for a few minutes. *Id.* at 130-31. Thereafter, two other men arrived, parked their vehicle at a gas pump, and entered the Turkey Hill. *Id.* at 132-34. Viera identified one of those men as Appellant. *Id.* at 134-35. Viera heard the victim make a comment to Appellant about a gold necklace Appellant was wearing, and Appellant responded to the victim in a sarcastic and macho manner by telling the victim to mind his own business. *Id.* at 135-39.

The two continued to exchange words and the conversation escalated as both men raised their voices. (N.T. at 138-39). When Appellant told the victim they could settle it outside, the victim agreed. *Id.* at 140. This testimony from the clerk directly contradicted the statement given by Appellant to the police, where Appellant claimed he simply told the victim to have a blessed day. During the conversation between the victim and Appellant, Viera observed the third

9

male (later identified as Luis Fuentes) attempt to calm Appellant down and get him to leave the store. *Id.* at 141-42. According to Viera, Fuentes did not raise his voice, he did not use profanity, nor did he make any threats or display a weapon. *Id.* Eventually, Appellant and Fuentes left the store, while the victim remained inside to purchase nachos. *Id.* at 143-44.

When the victim ultimately left the store, Viera saw he and Appellant exchanging words in the parking lot. (N.T. at 144-45). Fuentes was not part of that exchange. *Id.* The victim eventually walked away from Appellant, left the parking lot, and crossed the street. *Id.* at 145. Viera saw Appellant return to his car, pump gas, and get into the driver's seat. *Id.* at 146. Fuentes got into the right passenger side of the car. *Id.* Viera then saw Appellant drive out of the parking lot and make a right turn onto New Holland Avenue. *Id.* at 146-47.

Fuentes testified at trial that Appellant picked him up and they drove to Turkey Hill to buy a cigar and gas. (N.T. at 342). When they walked into Turkey Hill, Fuentes saw the victim standing in front of the cash register. *Id.* at 344-45. Fuentes heard the victim say something smart to Appellant, and the two began getting loud with each other. *Id.* at 345-47. Fuentes then heard the victim say to Appellant, "what's up with your chain?" *Id.* at 347-48. Appellant became angry with the victim, they were standing face-to-face, words were exchanged, and the victim challenged Appellant to a fight. *Id.* at 348-50. Fuentes tried to get Appellant to leave, but Appellant would not listen and he remained in the store. *Id.* at 350-51.

Shortly thereafter, Fuentes saw Appellant and the victim arguing outside in the parking lot. (N.T. at 353). At this point, Fuentes was back in the car and he could hear their loud voices but could not understand what was being said. *Id.* at 353-54. After the argument ended, the victim left the parking lot on foot and turned right towards the railroad bridge. *Id.* at 354-56.

10

Appellant then returned to the car and drove out of the parking lot. (N.T. at 356).

Fuentes was in the front passenger seat. *Id.* Appellant made a right turn and traveled east on

New Holland Avenue towards the bridge. *Id.* at 356-57. Appellant was driving slowly as he

approached the bridge, he put the driver's window down, and Fuentes heard three shots. *Id.* at

357-58. Fuentes noted that after Appellant fired the shots, he accelerated the vehicle. *Id.* at 359.

Fuentes saw Appellant holding a black .40 caliber gun in his right hand. *Id.* at 360.

According to Fuentes, Appellant then drove for twenty minutes on New Holland Avenue

until they got to a friend's house, where they stayed for ten to fifteen minutes. (N.T. at 363).

Appellant then drove back towards Lancaster City on New Holland Avenue until they neared the

crime scene. *Id.* at 363-64. When they saw police lights, they made a U-turn down a back road.

*Id.* at 364. Appellant later dropped Fuentes off at a friend's house in the city. *Id.* at 365.

As noted, this testimony by Fuentes was corroborated by the clerk at Turkey Hill. It was

also corroborated by other uncontested evidence presented at trial. For example, gunshot residue

was found in Appellant's car. (N.T. at 477-86). Three shell casings were found in the roadway

at the scene of the shooting, consistent with the three shots heard by Fuentes. *Id.* at 358, 560.

Appellant's cell phone records also confirmed the testimony of Fuentes regarding where they

went after the shooting and the roads they traveled. *Id.* at 520-27.[4]

---

[4] At trial, Fuentes admitted he lied to police during an interview on June 21, 2014, when he said he knew nothing about the shooting, because he was afraid of Appellant. (N.T. at 370-71). Fuentes admitted he lied to police during a second interview on August 7, 2014, because Appellant was still out on the street and Fuentes was scared. *Id.* at 371-72. On April 29, 2015, after he was arrested and incarcerated twice on unrelated gun charges, Fuentes gave a statement to police identifying Appellant as the shooter. *Id.* at 308-13, 372-76. Fuentes stated he was not promised a break on his pending gun charges, but admitted he was hopeful his testimony would result in a more lenient sentence. *Id.* at 376, 412-13. Fuentes' attorney also testified at trial that no offers had been made to Fuentes. *Id.* at 426. In explaining why he was now implicating Appellant, Fuentes stated "[b]ecause I knew I was lying and I couldn't sleep at night, and I just felt I was doing the right thing." *Id.* at 376.

11

Because this properly admitted evidence was overwhelming in establishing Appellant's guilt, and the outcome of the case was not affected in any meaningful way by evidence of Appellant's tattoo or the comments of the prosecutor in relation thereto, this claim must fail.[5]

## II. The PCRA Court did not err in finding that trial counsel was not ineffective for failing to file a motion to suppress evidence seized from Appellant's residence.

Appellant next asserts that trial counsel was ineffective for failing to file a motion to suppress evidence seized from Appellant's residence, because the search warrant failed to set forth probable cause to believe that items subject to seizure would be found in the place to be searched. *See* Statement. PCRA counsel further claims this evidence was prejudicial because it was introduced simply to "besmirch" Appellant's character. *Id.*

The Fourth Amendment requires that a warrant shall be issued by a "neutral and detached magistrate" based upon "an independent determination of probable cause." *Commonwealth v. Edmunds*, 586 A.2d 887, 905 (Pa. 1991). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Johnson*, 42 A.3d 1017, 1031 (Pa. 2012) (quoting *Commonwealth v. Thomas*, 292 A.2d 352, 357 (Pa. 1972)). The issuing magistrate makes a practical, common-sense decision "whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay

---

[5] Additional evidence at trial included bullet trajectory analysis which showed that the trajectory of bullet strikes was consistent with a bullet having been fired from the driver's window of Appellant's vehicle. (N.T. at 178-82, 206-12). A reconstruction expert further opined that the perpetrator of the shooting was located in Appellant's vehicle, to the exclusion of all other possible vehicles. *Id.* at 600. As will be discussed *infra*, this challenged evidence also did not affect the outcome of the case given the overwhelming evidence of guilt.

information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Gray*, 503 A.2d 921, 925 (Pa. 1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).

When evaluating whether probable cause exists for the issuance of a search warrant, the "totality of circumstances" standard is used as set forth in *Gates*, and as adopted by the Supreme Court of Pennsylvania in *Gray. Commonwealth v. Jones*, 668 A.2d 114, 116 (Pa. 1995). The Superior Court has noted:

> An affidavit for a search warrant is to be tested by this court with common sense and a realistic manner, and not subjected to overly technical interpretations; the magistrate's determination of probable cause is to be accorded great deference on review. The law is clear that before a search warrant may issue, facts supported by oath or affirmation must be presented to the issuing officer which will justify a finding of probable cause. For the warrant to be constitutionally valid, the issuing officer must conclude that probable cause exists at the time the warrant is issued. Such a conclusion may not be made arbitrarily and must be based on facts which are closely related in time to the date the warrant is issued.

*Commonwealth v. Vergotz*, 616 A.2d 1379, 1382 (Pa. Super. 1992) (internal citations omitted).

Probable cause is a practical, nontechnical, fluid concept that turns "on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules." *Commonwealth v. Glass*, 754 A.2d 655, 663 (Pa. 2000) (quoting *Gates*, 462 U.S. at 231-32). The magistrate may not consider any evidence outside the four corners of the affidavit when determining whether the warrant is supported by probable cause. *Commonwealth v. Sharp*, 683 A.2d 1219, 1223 (Pa. Super. 1996). "Probable cause either exists or it does not, and its existence must be evident solely from the affidavit itself." *Id.* The reviewing court is tasked with simply ensuring that the magistrate had a substantial basis for concluding that probable cause existed when the search warrant was issued. *Gray*, 503 A.2d at 925.

13

In the present case, Detective Brian Freysz ("Freysz") of the MTPD obtained a search warrant on June 27, 2014, to search the 1st floor apartment located at 344 N. Pine St, Lancaster, PA. *See* Application for Search Warrant and Authorization (attached to Amended PCRA Motion as Exhibit A). The items to be searched for and seized included any .40 caliber handguns, .40 caliber ammunition, magazines, casings, projectiles, a small envelop containing a .40 caliber bullet casing, a Glock gunbox, and other firearms accessories or paraphernalia. *Id.*

The affidavit of probable cause in support of the search warrant stated that Freysz has been employed by MTPD since September 2000, he was assigned to the criminal investigations division in September 2005, and he has investigated over 50 cases involving homicide, robbery, or aggravated assault. (Affidavit of Probable Cause, at ¶ 1) ("Affidavit"). Freysz received training in criminal investigations and crime scene processing, and he is certified by the Municipal Police Officers' Education and Training Commission as a police officer. *Id.*

On June 21, 2014, at approximately 3:31 a.m., MTPD responded to a report of a shooting, at which time they located the victim in the vicinity of 851 New Holland Avenue in Manheim Township. (Affidavit, at ¶ 2). The victim was transported to Lancaster General Hospital, where he later died, and an autopsy determined the cause of death was a single gunshot wound. *Id.*

Just prior to the shooting, the victim was inside a Turkey Hill store located at 806 New Holland Avenue. (Affidavit, at ¶ 3). According to Turkey Hill employees, the victim and an unknown male entered into a verbal argument inside the store, which continued into the parking lot after they left the store. *Id.* Freysz reviewed the Turkey Hill surveillance video and saw that at approximately 3:14 a.m., the victim engaged in a verbal altercation with a Hispanic male who was later identified as Mathew Morales. *Id.* at ¶¶ 4, 8. At approximately 3:18 a.m., the victim

14

was observed exiting the store parking lot and walking east along New Holland Avenue, until he was out of view of the surveillance camera. *Id.* at ¶ 4.

At approximately 3:20 a.m., Morales and another individual got into a light colored sedan and drove out of the Turkey Hill parking lot, turning east onto New Holland Pike in the same direction as the victim. (Affidavit, at ¶ 5). At approximately 3:22 a.m., the victim called 911 to report he had been shot. *Id.*

Three Federal .40 caliber bullet casings were found lying in the roadway across from where the victim was located. (Affidavit, at ¶ 6). The casings had a firing pin mark on the primer of each casing which Freysz knew was consistent with a Glock brand firearm based on his familiarity with Glock firearms and on his training, experience, and knowledge. *Id.* A background check determined that Morales was the registered owner of a Glock 23, .40 caliber semi-automatic pistol, and he possessed a valid concealed weapons/carry permit. *Id.* at ¶ 9.

On June 21, 2014, at 10:10 p.m., Morales told detectives he resided at 344 North Pine Street, 1st floor, Lancaster City, Pennsylvania. (Affidavit, at ¶ 10). Morales admitted to police that he was involved in a verbal argument with the victim at the Turkey Hill, he traveled east on New Holland Avenue after the argument, and he purchased a Glock .40 caliber semi-automatic pistol two to three years ago. *Id.* Morales claimed the handgun was stolen three weeks prior to this incident, but he was able to provide the serial number for the stolen firearm because he kept everything from the purchase of the firearm. *Id.* Freysz confirmed that Morales filed a report of a stolen firearm on May 19, 2014, and the firearm had not been recovered. *Id.*

Allison Smithgall told Freysz that Morales purchased a Glock .40 caliber semi-automatic pistol from her business on March 8, 2012. (Affidavit, at ¶ 11). She further stated that Glock

15

test-fires their handguns prior to shipping them and they place one of the bullet casings from the test fire in the gun box for that specific firearm. *Id.*

On June 26, 2014, police obtained surveillance video which showed that on June 20, 2014, at 8:25 p.m., Morales exited his residence and walked to his vehicle carrying a small, dark object. (Affidavit, at ¶ 13). Morales then placed an item in the trunk of his vehicle. *Id.* On June 21, 2014, at 2:02 p.m., Morales is seen returning to the residence in his vehicle, opening the trunk, removing a small, dark colored item from the trunk, and carrying it into the residence. *Id.*

Based on his experience, knowledge, training, and years as a criminal investigator, and based on the facts as outlined in the affidavit, Freysz had reason to believe that Morales used his .40 caliber Glock pistol to shoot and kill the victim. (Affidavit, at ¶ 17). It was probable that Morales concealed the murder weapon at his residence after the shooting, even though he had previously reported his Glock as stolen, because individuals will often times nefariously report firearms as stolen to commit insurance fraud or engage in other criminal conduct. *Id.* at ¶¶ 15-16. There was reason to believe that Morales still possessed the original gun box, which would contain a test-fired bullet casing that could be used to compare to the bullet casings found at the crime scene to determine if the same handgun was used to shoot the victim. *Id.* at ¶¶ 14, 17. Further, individuals who possess firearms are known to possess related paraphernalia, including ammunition, magazines, casings, projectiles, holsters, and other accessories. *Id.* at ¶ 16.

After examining the totality of the circumstances in this case, the PCRA court concluded that the issuing authority had a substantial basis for determining probable cause existed within the four corners of the affidavit to establish that Appellant shot and killed the victim. Appellant engaged in a verbal altercation with the victim at a Turkey Hill store just moments before the

16

shooting. Following the altercation, the victim exited the store parking lot and began walking east along New Holland Avenue. Two minutes later, Appellant got into his vehicle and drove east in the same direction as the victim. Approximately two minutes after that, the victim called 911 to report he had been shot. Three Federal .40 caliber bullet casings were recovered at the scene, which were consistent with a Glock brand firearm. Appellant was the registered owner of a .40 caliber Glock semi-automatic handgun.

The issuing authority also had a substantial basis for determining that the murder weapon, original gun box, and firearm-related paraphernalia would be located at Appellant's residence. When discussing the serial number, Appellant told Freysz that he had kept everything from the firearm purchase, and it would be reasonable to conclude that those items were in the residence. Furthermore, on June 20, 2014, only hours before the shooting, Appellant was seen exiting his residence and walking to his vehicle carrying a small, dark object which he placed in the trunk of his car. Hours after the shooting, Appellant was seen returning to the residence in his vehicle, opening the trunk, removing a small, dark colored item from the trunk, and carrying this item back into his residence. Although Appellant had reported his firearm stolen three weeks earlier, Freysz noted that individuals oftentimes nefariously report firearms as stolen to commit insurance fraud or engage in other criminal conduct.

When an ineffective assistance of counsel claim is based on the failure to move for the suppression of evidence, a petitioner must first establish that there was no reasonable basis for counsel to fail to pursue the suppression claim. *Commonwealth v. Johnson*, 179 A.3d 1153, 1160 (Pa. Super. 2018). Where the basis for the suppression motion is meritless, counsel cannot be deemed ineffective for failing to raise the issue. *Commonwealth v. Costanzo*, 455 A.2d 153,

17

155-56 (Pa. Super. 1983). In *Commonwealth v. Watley*, 153 A.3d 1034 (Pa. Super. 2016), the Superior Court found that counsel was not ineffective for failing to move for the suppression of evidence from a search where, under a totality of the circumstances, the officers had reasonable suspicion and the search was reasonable. *Id.* at 1044-46.[6]

In the present case, trial counsel stated at the PCRA hearing that he reviewed the search warrant and considered filing a motion to suppress evidence obtained from the search warrant. (N.T. PCRA at 28-29). However, counsel "did not believe that a motion to suppress had any merit to it, so I did not file it." *Id.* at 29. Trial counsel was correct. Therefore, because a suppression motion would have been meritless, trial counsel cannot be deemed ineffective for failing to file such a motion.

Assuming, *arguendo*, there was no reasonable basis for failing to pursue the suppression claim, a defendant must also show that if the evidence had been suppressed there is a reasonable probability the verdict would have been more favorable. *Commonwealth v. Melson*, 556 A.2d 836, 839 (Pa. Super. 1989). In this case, there is no reasonable probability the verdict would have been more favorable to Appellant if evidence from the search had been suppressed, because the uncontested evidence was overwhelming in proving Appellant's guilt beyond a reasonable doubt. Conversely, items seized pursuant to the search warrant were of little significance, particularly when no evidence was found that connected Appellant to the murder, Appellant possessed a valid concealed weapons/carry permit, and he had registered his Glock.

---

[6] *See also Commonwealth v. Strader*, 396 A.2d 697, 701 (Pa. Super. 1978) (counsel not ineffective for failing to file a pretrial motion to suppress identification where such a motion would have been meritless); *Commonwealth v. Edwards*, 762 A.2d 382, 390-92 (Pa. Super. 2000) (counsel not ineffective for failing to file a motion to suppress victim's identification since there existed a sufficient independent basis for the identification).

18

**III. The PCRA Court did not err in finding that trial counsel was not ineffective for deciding not to call Frank M. Costanzo as an expert in accident reconstruction analysis.**

Appellant further asserts that trial counsel was ineffective for failing to call accident reconstruction analyst Frank M. Costanzo ("Costanzo") as an expert witness to rebut the testimony of Sergeant Jeffrey Jones ("Jones") of the MTPD. *See* Statement. PCRA counsel claims that Costanzo was prepared to testify the analysis performed by Jones was flawed, there was insufficient evidence to determine the location of Appellant's vehicle at the time the victim was shot, and counsel's decision not to call Costanzo was "unreasonable on its face." *Id.*[7]

At trial, Jones was recognized by the court as an expert witness in forensic reconstruction. (N.T. at 549-58). Jones testified that a few months after the shooting he was asked if he could reconstruct the crime scene. *Id.* at 561-62. Jones then reviewed a surveillance video from the Turkey Hill store where the victim was located prior to the shooting and a video from Tommy's Auto Center, which was located east of where the shooting occurred. *Id.* at 562-63. Jones synchronized the videos and conducted an analysis. *Id.* at 563.

Jones explained that the Turkey Hill video on New Holland Avenue recorded the victim arguing with Appellant in the parking lot prior to the shooting. (N.T. at 572). The victim's path can then be seen as he walks away from Appellant and out of the video. *Id.* at 573. When the victim took his first step to walk away, Jones started his analysis to determine the distance from the victim's stationary position while arguing with Appellant until the victim disappeared behind a gas pump. *Id.* at 575, 579. Jones found this distance to be 75 feet. *Id.* at 579-80. Using the

---

[7] In his PCRA petition, Appellant alleged that trial counsel "was ineffective for failing to hire an expert accident reconstruction analyst to rebut Sergeant Jones opinion." *See* PCRA petition, ¶¶ 6(ii), 21-24. However, Appellant acknowledged at the PCRA hearing that counsel did hire an expert, and counsel discussed with Appellant the possibility of calling the expert as a witness at trial. (N.T. PCRA at 35-38).

19

time clock on the Turkey Hill video, Jones further determined it took the victim 21 seconds to walk that 75 feet, for a walking speed of approximately 3.57 feet per second. *Id.* at 581-82.[8]

Approximately 136 seconds after the victim took his first step, Appellant's car left the gas pump and was at the driveway. (N.T. at 585). Using a stopwatch and an exemplar vehicle with the same type of engine and transmission as Appellant's vehicle, Jones determined it took an average of 12.23 seconds for a vehicle going the speed limit of 35 miles per hour to travel from the stop sign at the driveway exit to the location where the victim was found. *Id.* at 586-88. Therefore, after the victim began to walk away, it took a total of 148.23 seconds for the vehicle to travel to the location where the victim was shot. *Id.* at 588.

When the victim emerged from behind the gas pump, the video showed him walking away at an acute angle towards his final destination. (N.T. at 582-84). Because the victim was immediately paralyzed when he was shot, Jones had a definite ending point. *Id.* at 590. By walking 3.57 feet per second, the victim would have traveled approximately 529.38 feet during the 148.23 seconds it took Appellant to reach the location where the victim was shot. *Id.* at 589. In fact, the victim was found 535.87 feet from where he started his walk, or only 6.49 feet from where Jones calculated the victim would have been shot by Appellant based on the time it took for the victim to walk that distance and for Appellant to drive to that location. *Id.* at 589-91.

Jones then examined surveillance video from Turkey Hill and Tommy's Auto Center to identify other vehicular traffic on New Holland Avenue, since the videos covered two points of reference, the victim was shot between those locations, and no other vehicle could have accessed

---

[8] Jones described in great detail the highly sophisticated ARAS 360 HD forensic animation program he used to measure these points to scale, his training for use of this crime scene software, and how he used the program to arrive at his conclusions. (N.T. at 575-79).

New Holland Avenue between those locations. (N.T. at 562-66, 591-92). Jones concluded that no other vehicle could have been involved in the shooting because the victim would not have been at his final resting place when any other vehicle reached that location. *Id.* at 593-97.[9]

Additionally, Jones used the videos to time the speed of seven vehicles that passed by the two cameras, and he determined it took Appellant's vehicle approximately 11.6 seconds longer than the six other vehicles to travel that same distance. (N.T. at 597-99). According to Jones, this slower speed allowed Appellant to reach the victim in the victim's timed walk, to shoot the victim, and then drive away. *Id.* at 600. Jones concluded that Appellant's vehicle was the only vehicle in the vicinity of the victim at the time the victim was shot and killed. *Id.*

At the PCRA hearing, Costanzo testified that prior to trial he reviewed a PowerPoint presentation and an animation prepared by Jones, and he met two times with trial counsel. (N.T. PCRA at 10, 16-17).[10] During their meetings, Costanzo assisted counsel in preparing for the cross-examination of Jones, and he identified seven key points counsel should make. *Id.* at 18. When asked whether he reviewed the trial transcript to see whether trial counsel's cross-examination of Jones contained everything they discussed in preparation, Costanzo stated, "I

---

[9] Jones measured the speed of a light-colored SUV and noted it passed the Turkey Hill driveway 116 seconds after the victim began walking from the parking lot, but explained the SUV could not have been involved in the shooting because the victim did not have enough time to get to the point where he was found based on his walking speed. (N.T. at 593-95). Jones did say that in theory the victim could have sprinted and made it in time, but the evidence did not support such a theory. *Id.* at 595-96.

[10] Costanzo testified that he owns Accident Cause and Analysis. (N.T. PCRA at 5). He is a 1982 graduate of Indiana University of Pennsylvania with a degree in safety science, he has been reconstructing traffic accidents since 1983, and he spent ten years with the National Highway Traffic Safety Administration. *Id.* at 5-6. Costanzo has owned his business for about twenty years, and he has taught police officers for about fifteen years. *Id.* at 6. Costanzo is a member of the Society of Automotive Engineers and INCR, which is a talk group for accident reconstruction. *Id.* at 7. The court recognized Costanzo as an expert in the area of forensic reconstruction. *Id.* at 8.

think he basically followed the script of the cross-examination, yes." *Id.* at 18-19. Costanzo added, "I read the testimony, the courtroom testimony of when it went to trial, and he followed through the questions that we prepped. He followed through with the cross examination based on the prepping." *Id.* at 18.[11]

According to Costanzo, the time-distance analysis used by Jones was flawed because the walking speed for the victim was based solely on the victim walking for 75 feet, and there was no evidence to show the victim maintained a constant walking speed for the entire 545 feet. (N.T. PCRA at 11-12). Thus, Costanzo could not determine where Appellant's vehicle was located at the time of the shooting. *Id.* at 12. Costanzo also questioned the use of the exemplary vehicle, use of the videos to rule out the SUV or other suspect vehicles, and the lack of a video at the crime scene to rule out a pedestrian as the shooter. *Id.* at 13-15. Costanzo stated that although he did not prepare a report for trial, he was available to testify. *Id.* at 16-17.

During the PCRA hearing, trial counsel stated that he retained Costanzo as an expert and met with him on a number of occasions. (N.T. PCRA at 24). Costanzo informed counsel that he did not believe there was sufficient information available for Jones to provide an opinion on time-distance analysis, or to determine the location of Appellant's car at the time of the shooting. *Id.* at 24-25. Trial counsel and Costanzo discussed "at length" whether it would be advantageous to call Costanzo as an expert witness at trial. *Id.* at 21. Trial counsel then explained his reason for deciding not to call Costanzo as a witness:

---

[11] Costanzo prepared a report for PCRA counsel dated November 1, 2017, which was marked as Defendant's Exhibit #2. (N.T. PCRA at 9). The points Costanzo outlined in his report to PCRA counsel were the same as those Costanzo reviewed with trial counsel prior to trial in preparation for cross-examination, and the same as those trial counsel raised with Jones on cross-examination. *Id.* at 18.

I had a strategic reason, and the reason was that I was under an order that if Mr. Costanzo was to testify, I would have to provide the Commonwealth with a report detailing his opinion. I believed that if the Commonwealth was in possession of that report and in possession of the information and the ammunition, essentially, that I was going to use to cross-examine their expert, that they would be able to prepare for my cross examination, and also they would be more prepared for what theories I was going to use in my closing argument to discredit . . . Sergeant Jones's testimony.

*Id.*[12]

Thereafter, trial counsel did use information provided by Costanzo to effectively cross-examine Jones about the assumptions and lack of information contained in Jones' report. (N.T. PCRA at 22, 25). During questioning, Jones admitted his opinion about the victim's walking speed was based on an assumption that the victim maintained the same walking speed. (N.T. at 612-13). However, Jones agreed he was not able to offer any direct evidence to show that the victim maintained such a walking speed. *Id.* at 621. Counsel also got Jones to concede that if the victim increased his walking speed to 5.144 feet per second, the victim would have been at the 535-foot mark when the SUV passed him. *Id.* at 613-15.

Trial counsel then had Jones read from the book *Pedestrian Accident Reconstruction*, which stated that the average walking speed for a man the victim's age would be 5.4 feet per second. (N.T. at 617-19); (Def. Exh. #4). As such, Jones admitted his assumed walking speed was slower than average. (N.T. at 618-20). When Jones suggested the victim may have been walking slower because he was concentrating on something else, trial counsel got Jones to acknowledge that he did not know whether the victim was on his phone, there was no evidence that the victim was eating, and no evidence he was legally intoxicated. *Id.* at 616, 620-21.

---

[12] Trial counsel was a prosecutor for seven years, handling murders and other major crimes. (N.T. PCRA at 31). Since 2011, he has been a criminal defense attorney. *Id.* at 32. Counsel has been involved in approximately 35 jury trials, and is presently assigned complex felony cases. *Id.* at 32-33.

To be effective, trial counsel need not introduce expert testimony if counsel is able to effectively cross-examine the prosecution's expert witnesses and elicit helpful testimony. *Commonwealth v. Marinelli*, 810 A.2d 1257, 1269 (Pa. 2002). The question on a claim of ineffective assistance of counsel when trial counsel fails to call an expert witness is whether or not defense counsel effectively cross-examined the Commonwealth's expert witness. *Commonwealth v. Williams*, 141 A.3d 440, 464 (Pa. 2016).

In *Commonwealth v. Collins*, 957 A.2d 237 (Pa. 2008), the defendant failed to show that trial counsel lacked a reasonable strategic basis for choosing not to call a ballistics expert at a murder trial, and thus the defendant did not establish ineffective assistance of counsel, even though the expert would allegedly have testified that the shots were more likely fired from the driver's seat of a vehicle rather than from the back seat where the defendant was sitting. *Id.* at 248-49. For strategic reasons, counsel decided instead to cast suspicion on the driver of the car or members of a gang that had beaten the victim one day before the murder. *Id.*

In *Commonwealth v. Wholaver*, 177 A.3d 136 (Pa. 2018), the appellant argued that counsel was ineffective for failing to obtain an independent expert to counter the Commonwealth's expert. *Id.* at 149. The Supreme Court disagreed, holding that the appellant could not establish he was prejudiced by counsel's decision not to obtain an expert to diminish the weight of the Commonwealth's expert testimony. *Id.* at 150. At best, such an expert may have lessened the impact of the Commonwealth expert's scientific conclusion. *Id.*

Trial counsel is given broad discretion to determine trial strategy. *Fowler, supra.* As such, counsel need not introduce expert testimony if they can effectively cross-examine the prosecution expert and elicit helpful testimony. *Marinelli, supra.* Presently, counsel met with an

expert at least two times and obtained information from that expert which he then used to effectively cross-examine the Commonwealth's expert witness. As a result, counsel called into question the Commonwealth expert's conclusions. Counsel made a reasonable strategic decision to proceed in this fashion rather than call his expert as a witness, which would have required him to provide the Commonwealth with advance notice of the manner in which counsel would attempt to rebut their expert. Trial counsel here will not be deemed ineffective for deciding not to call a witness who would have at best lessened the impact of the Commonwealth's expert.

Additionally, for the reasons previously stated, Appellant has failed to show that a reasonable probability exists the outcome of his trial would have been different if counsel had called Costanzo as a witness.

## IV. The PCRA Court did not err in finding that trial counsel was not ineffective for failing to object to the non-expert testimony offered by Detective Wettlaufer regarding trajectory analysis.

Finally, Appellant asserts that Detective Wettlaufer gave impermissible expert opinion testimony on bullet trajectory without properly being qualified as an expert, the evidence was prejudicial to Appellant, and trial counsel was ineffective for failing to object to this testimony. *See* Statement.

Detective Wettlaufer of the MTPD testified that he assisted in processing the crime scene. (N.T. at 166). Wettlaufer, who is trained in trajectory analysis involving damage to physical structures, conducted a process called trajectory rod lining, which involves finding at least two points and lining up an aluminum rod between the points to deduce the direction a bullet would have traveled once it left the barrel of a gun. *Id.* at 178-79. Wettlaufer briefly discussed his training and experience, but he was not offered as an expert witness by the Commonwealth. *Id.*

25

at 165-66. In fact, Wettlaufer made it clear to the jury that he was not testifying as an expert, nor was he offering an opinion to a reasonable degree of scientific certainty. *Id.* at 211.[13]

Where no attempt has been made to qualify a witness as an expert in a disputed field, that expert's opinion may be excluded. *Commonwealth v. Duffey*, 548 A.2d 1178, 1186 (Pa. 1988). In *Duffey*, where the appellant argued the trial court erred by admitting the non-expert testimony of a police officer about high speed blood splatter, the Supreme Court held that the trooper's testimony constituted expert testimony, and the judge erred in admitting the testimony. *Id.*

However, in *Commonwealth v. Kennedy*, 151 A.3d 1117 (Pa. Super. 2016), the Superior Court found that the trial court did not abuse its discretion in denying the defendant's pretrial motion in limine to exclude lay opinion testimony from a police officer regarding bullet trajectory and trajectory rod analysis. *Id.* at 1122, 1127. The Superior Court stated:

> Opinions regarding blood spatter and the specific height that blood would reach during a violent attack are not easily reached based the witness' perception. Instead, technical and scientific knowledge about physiological parameters and the mechanics of blood spatter are required for such testimony. Furthermore, such blood spatter testimony required the officer to know what type of stab wounds are capable of causing blood to exit the body at those velocities. Contrast that to the type of bullet trajectory testimony offered by [the officer] in this case. Any individual could place a rod in a bullet hole and discern which direction the bullet traveled. Thus, the blood spatter testimony in *Duffey* is factually dissimilar to the type of bullet trajectory testimony offered by [the officer] in the case *sub judice*.

*Id.* at 1123 (citations omitted).

---

[13] Wettlaufer testified he located a fresh strike in the brick mortar of a building, and a bullet fragment was found on the ground below the impact strike. (N.T. at 176, 193). He also located bullet strikes on branches right before the wall and near the front of a bush. *Id.* at 176, 179-80. Wettlaufer lined up an aluminum rod between the strike in the brick mortar and the strikes in the two branches. *Id.* at 178-82. By pulling string from various places on a vehicle similar to Appellant's car to the location where the bullet impacted the branches and brick wall, the results were consistent with a bullet being fired from the driver's side of the vehicle or from someone leaning over the hood. *Id.* at 208-12, 223-24.

Although the need for expert or lay opinion testimony in relation to bullet trajectory was one of first impression in Pennsylvania, the Superior Court in *Kennedy* noted that "the idea of lay opinion testimony regarding bullet trajectory is not new." 151 A.3d at 1123, 1125. The Court cited as persuasive authority several other courts that have admitted this testimony as lay opinion testimony. *Id.* at 1123-25.[14]

Pursuant to *Kennedy*, the testimony provided by Wettlaufer in the present case clearly fell within the realm of lay opinion testimony. Although *Kennedy* was decided after the trial in the present case, trial counsel surely cannot be held ineffective when the law later confirmed that counsel's objection would have been meritless.

Assuming, *arguendo*, this evidence was impermissible, it was not prejudicial. During cross-examination, Wettlaufer admitted he was not able to obtain an exact scientific calculation as to where the bullet would strike if it was fired from a car driving in the eastbound lane. (N.T. at 223). He further admitted there is a margin of error when using string instead of a laser. *Id.* at 226. Wettlaufer also acknowledged the shot could have come from someone in the street if they were crouched. *Id.* at 225. Additionally, while counsel noted there was an SUV traveling westbound around the time of the shooting, Wettlaufer stated that officers did not test to see if a westbound vehicle could have caused the bullet strike because they did not know there was a westbound vehicle at the time of the shooting. *Id.* at 224-25.[15]

---

[14] *See United States v. Beckford*, 211 F.3d 1266 (4th Cir. 2000) (unpublished); *Colorado v. Caldwell*, 43 P.3d 663 (Colo. App. 2001); *Prince v. Maryland*, 85 A.3d 334 (Md. Ct. Spec. App. 2014); *United States v. Pierson*, 503 F.2d 173 (D.C. Cir. 1974).

[15] At the PCRA hearing, trial counsel testified he did not consider objecting to Wettlaufer's testimony because it was beneficial to the defense. (N.T. PCRA at 26).

Furthermore, there is no reasonable probability that the verdict would have been more favorable to Appellant if the evidence was precluded, because the uncontested evidence presented at trial was overwhelming in proving Appellant's guilt beyond a reasonable doubt.

## CONCLUSION

Based on a thorough review of the record, this court properly concluded that Appellant had failed to meet his burden of proving by a preponderance of the evidence that the underlying claims were of arguable merit, or that trial counsel provided ineffective assistance of counsel. Accordingly, the court entered an order dismissing the Amended PCRA Petition. For the reasons stated herein, this appeal should be denied and the trial court should be affirmed.

BY THE COURT:

_____September 7, 2018_____
DATE

_____
DONALD R. TOTARO, JUDGE

ATTEST:

Copies:     Travis S. Anderson, Esquire, Assistant District Attorney
            Vincent J. Quinn, Esquire, Counsel for Appellant

LANCASTER COUNTY, PA
2018 SEP -7 PM 1: 51
CLERK OF COURTS

28